## Staunton.

### ALMOND v. WILSON.

### Absent, *Moncure,* P.

1. A bill in equity is brought to subject to the lien of the plaintiff's judgment his debtor's estate, alleged to have been fraudulently conveyed to various persons, all of whom are made defendants; but there is no charge of combination and confederacy among the alienees. HELD: The bill is not multifarious. Although a plaintiff cannot demand several matters of different natures against several defendants, a demurrer will not lie, even though the defendants be unconnected with each other, where there is one common interest centering in the point in issue in the cause.

2. When the bill is against fraudulent alienees, the matter in litigation is the fraud charged in the management and disposition of the debtor's property, in which charge all the defendants are interested, though in different degrees and proportions.

3. It is sufficient if the bill substantially charges a fraudulent combination to hinder and delay creditors in the collection of their debts. And where the facts stated show the fraudulent act and intent, it is a sufficient averment of fraud, although the bill does not state that the act was fraudulent.

4. An issue out of chancery, except in cases of contested wills, is a mere incident to the suit. Its object is to satisfy the conscience of the chancellor in a doubtful case. If he is not satisfied with the verdict, he may set it aside and grant a new trial, or he may proceed to decide the cause without the intervention of another jury. No injury can result to the defendant in awarding it, unless it be a case in which the bill ought to be dismissed at the hearing.

5. When the defendant himself concedes that there is such a conflict of testimony as to call for a jury, the court ought to feel less difficulty in directing it. In this case the report of the commissioner, the verdict of the jury and the opinion of the chancellor all concur, each of whom was confronted with the witnesses, and had the fullest opportunity of testing

their accuracy, credibility and sources and means of information under the test of a public cross-examination. Under such circumstances it would be an unusual exercise of appellate jurisdiction to reverse the decree of the court below. Such a course would be in violation of the practice and rule of this court from the foundation of the government.

6. W A purchased a tract of land at a judicial sale, ostensibly for himself, but really and fraudulently in behalf of D F, who was ultimately to pay the purchase money and then direct a conveyance to himself. A decree had been rendered in another suit against D F, as executor of H A F, and satisfied by W A W, his surety. W A W thereupon sought to subject the said land as D F's property to the lien of the decree, and the whole tract was ordered to be sold. HELD : That W A, having been guilty of a fraud, could not claim a resulting trust in the land by way of security for any money paid by him for D F on the said pretended and fraudulent purchase, nor could W A share *pro rata* with W A W in the proceeds. The law does not so far countenance fraudulent contracts, as to protect the perpetrator to the extent of his investment.

On the 5th of April, 1875, William A. Wilson filed his bill in the clerk's office of the circuit court of Rockbridge county, against David Firebaugh, Watson Almond, R. D. Firebaugh, trustee; Jane E. Firebaugh, wife of David Firebaugh; Mason & Gooch, partners; and James W. Frazier, in which he alleged that in October, 1861, David Firebaugh qualified as the executor of H. A. Firebaugh, deceased, and that the plaintiff and B. F. Firebaugh became the sureties on his bond in the penalty of $15,000; that the said executor, in a suit brought by himself for the purpose of settling his accounts, was found indebted to his testator's estate in the sum of $1,943.64, with interest from April 1, 1871, for which amount a decree was entered against the said executor on the 10th of April, 1871, and against the plaintiff, his surety, on the 20th of February, 1875; that the said executor was totally insolvent and had paid no part of said decree, but had fraudulently concealed and covered up all his personal property with the clear intent of avoiding the payment of said decree, and throwing the whole burden thereof upon the plaintiff; that on the 15th of May, 1871,

the said executor, in consideration of the payment of two executions against him in favor of the United States, amounting to $1,145.22, conveyed to Mason & Gooch a large amount of valuable personal property, of which, by a written agreement between the parties, the said executor was authorized to retain possession until demanded by Mason & Gooch, and the conveyance and agreement were both recorded; that on the 7th of August, 1872, the said Mason & Gooch, by deed duly recorded, conveyed the same personal property to R. D. Firebaugh, trustee for Jane E., the wife of the said David Firebaugh, in consideration of $1,230.31, alleged to have been paid by the said R. D. Firebaugh to Mason & Gooch. It was charged that the said deed of trust was wholly fraudulent and void, and that the alleged consideration passed from David Firebaugh and not from R. D. Firebaugh; that the trust resulted to the said David; that the property was still his, and liable to the lien of the *fi. fa.*, issued on the said decree against him. The plaintiff stated that he had already paid a considerable part of said decree to J. G. Steele, the receiver of the court, in whose favor the decree was rendered. It was further shown, that in February, 1873, the said David Firebaugh filed his petition in bankruptcy; but it was charged that his schedules were false and fraudulent, in failing to surrender any of his personal property, some of which was enumerated in the bill of sale and deed of trust aforesaid; that he failed to give in a tract of 6¾ acres of land, which he sold in December, 1873, to James W. Frazier for $300, and also failed to give in another tract, called the Snider farm, which the plaintiff insisted he still owned. It was further shown, that on the 20th of June, 1867, the said David Firebaugh became the purchaser from the commissioner of sale, in the suit of D. Snider v. John Snider's heirs, of a valuable tract of land known as the Snider farm, at the price of $9,051; that he made the cash payment of

$142.51, and paid the further sum of $4,444.85 at differant times, when, failing to make further payments, the farm was decreed to be resold on the 3d of January, 1872, and Watson Almond became the purchaser for $5,600, paying the cash payment of $152.66, and executing three bonds for $1,815.78 each, payable at one, two, and three years. The bill charged that before the said sale was consummated, it was agreed, whether formally or otherwise, between the said David Firebaugh and Watson Almond that the latter should be only a nominal purchaser for the benefit of the former, the said David Firebaugh undertaking to make the cash payment and to pay the several bonds of Almond as they matured; and when the whole purchase money was paid, Almond was to cause the property to be conveyed as Firebaugh might direct. It was further insisted, that the said sale of 6¾ acres to James W. Frazier, being made after Firebaugh's bankruptcy, the land not being included in his schedule, was fraudulent; that the bonds taken were not made payable to any one, lest the fraud might be exposed, and that the decree against the said executor was a lien on said land. It was further shown, that the executor, in order to conceal his fraud in the transaction with Almond, entered into a formal written lease of the Snider farm from him, for a term of four years, at an annual rent of $600, which lease was charged to be pretended and false, and designed to protect Firebaugh from his creditors. The prayer of the bill, after requiring answers from the defendants, was, that David Firebaugh and Almond might produce their agreement as to the purchase of the Snider farm; that the deed of trust from Mason & Gooch to R. D. Firebaugh, trustee, might be set aside as fraudulent and void, and that the property thereby conveyed subjected to the lien of the execution issued upon the said decree, and that the lien of the decree might be enforced against the said 6¾ acres of land, and the interest of the said David Firebaugh in the Snider farm, and for general relief.

At September rules, 1875, David Firebaugh and Watson Almond demurred to the bill for multifariousness, and the demurrer being overruled, they filed their answer, in which, after admitting certain allegations of the bill, they went on to say that it was not averred therein, nor did it otherwise appear, that the plaintiff had paid the said decree or any part thereof, and it was insisted that until he had shown this he had no right to institute the suit. It was further stated that the transactions between Mason & Gooch and the respondent, D. Firebaugh, were matters of record, some of which were -exhibited with the bill; that the papers showed that the property of the respondent had been levied upon by the United States marshal to satisfy two executions in his hands, which were first liens thereon; that a forthcoming bond had been taken and forfeited, and when the officer was about to proceed to enforce payment, the arrangement with Mason & Gooch was entered into fairly and openly, and to save the property from sacrifice, which property was transferred to secure Mason & Gooch the money advanced by them to pay off the executions. It was denied that any fraud had been committed by any of the parties concerned, and the answer then proceeded to set forth what had become of the property in question, some of which was used, some destroyed, and the residue surrendered by the respondent when he filed his petition in bankruptcy in February, 1873. The answer further showed that the respondent surrendered several tracts of land, including the tract of 6¾ acres, which had been sold to Frazier. The homestead asked for embraced a tract of 66 acres and the tract sold to Frazier, the former of which was then occupied by the respondent and the latter by Frazier. The Snider tract was not included in the schedule, because the respondent did not own it, for having proved unable to pay for it, it was, upon a decree of resale, purchased by Watson Almond on the 3d of January, 1872, for $5,600, some-

thing less than the balance still due upon it; and it was
insisted that Almond was a *bona fide* purchaser, and had
fully paid for the land out of his own means.  It was denied
that there was either an oral or a written contract that
Almond should be a nominal purchaser for the benefit of
D. Firebaugh, or that when the latter had paid the cash
payment and the bonds given for the purchase money by
Almond, he was to cause such conveyance to be made as D.
Firebaugh should direct; but it was admitted that after
the sale an agreement for a lease for four years of the farm
was entered into by these parties at a yearly rent of $600,
which agreement was recorded in the clerk's office of said
county in January, 1872.  It was further insisted that the
only money paid by D. Firebaugh to Almond was in satis-
faction of the rent contract and $349.42 for cattle bought
from him, which latter sum was paid to Steele by Almond's
direction in the fall of 1872, and no money was paid under
any other contract, verbal or written.  It was further in-
sisted that if the notes were not payable to any one, as
charged in the bill, Frazier was equally guilty of the fraud,
if any were intended, but it was denied that the fact justi-
fied such an inference.

Almond, in his part of the answer, said he knew nothing
of the suit between his co-defendant and H. A. Firebaugh's
legatees, or of the transactions with Mason & Gooch, or of
the said bankruptcy proceedings, or the sale of 6¾ acres of
land to Frazier.  But he believed that D. Firebaugh in
June, 1867, became the purchaser of the Snider farm under
a decree of court, at the price of $9,051; that he paid the
cash payment and further sums from time to time, amount-
ing in all to $4,587.36; and that, being unable to make the
other payments, the farm was resold and the respondent
Almond became the purchaser for $5,600, made the cash
payment and executed three bonds as stated in the bill.
Respondent further said that he had paid the cash pay-

ment, the first bond, and nearly all of the second, from his own means exclusively, but denied that he was a nominal purchaser for the benefit of D. Firebaugh, and that any contract was made between him and the respondent by which Firebaugh should pay the cash payment and the bonds as they matured and when the whole purchase money was paid, direct a conveyance from the respondent.

James W. Frazier also answered, and said that in December, 1873, David Firebaugh sold him a tract of $6\frac{3}{4}$ acres of land for $300, whereupon the respondent executed two bonds of $150 each, payable on the first days of January, 1874 and 1875, which bonds were drawn by David Firebaugh, and the first had been paid. Firebaugh informed the respondent that he was about to apply for the benefit of the bankrupt act and would have the said tract assigned as his homestead, so that he could then make a deed for it. He afterwards informed the respondent that he had forgotten to surrender the said tract; but claimed the purchase and stated that he could and would make a good deed. An agreement was drawn up by Firebaugh for the sale of the land, but he would not sign it, nor make the bonds payable to himself, as he did not wish the bankrupt court to know the amount he was to receive for the land. Firebaugh had made repeated demands for the balance of the purchase money, but the respondent having an unsettled account against him, and being informed that he could not safely pay the same, or receive a good deed from Firebaugh, had refused to pay the said balance.

S. D. Gooch, answering for Mason & Gooch, said that a large amount of personal property had been conveyed to them by David Firebaugh, in consideration of their paying to the United States marshal the amount of two executions against him; that the said debt, principal and interest, was paid to them in full, partly in corn, oats, flour, beef, &c., and the balance in money. The respondents could not say

by whom the grain and provender were delivered, whether by R. D. Firebaugh or David Firebaugh, but upon a settlement with the latter and the payment of the whole debt, he directed the respondents in releasing the property to convey it to R. D. Firebaugh as trustee for the wife of David Firebaugh. The respondents did not know R. D. Firebaugh in the transaction, but upon the settlement with David Firebaugh, they conveyed the property as he directed; they, like the other respondents, denied fraud, combination, etc.

The cause coming on to be further heard on the 13th of March, 1878, on the bill, the said answers, the depositions of witnesses and exhibits filed, the court decreed that the following accounts be taked: 1st. An account of the decree in the bill mentioned as rendered against the plaintiff, how much had been paid thereon and how much remained unpaid; 2d. An account of the real estate subject to the lien of said decree and of its fee simple and annual value; 3d· An account of the property conveyed by David Firebaugh to Mason & Gooch, and by them conveyed to R. D. Firebaugh, trustee, how it had been disposed of and how much remains in existence and liable to the execution issued on said decree; and 4th. An account of the purchase money of the Snider farm, how much had been paid and how much remained unpaid; and the commissioner was directed to ascertain how much of said money was paid by Watson Almond out of his own means and how much out of the means of David Firebaugh; how much was paid out of the property conveyed to Mason & Gooch and by them to R. D. Firebaugh, trustee, and how much was paid out of the crops raised on the Snider farm.

The commissioner, after examining numerous witnesses for the plaintiff and defendants, reported as follows, on the 17th of January, 1879: That the amount of the said decree against David Firebaugh and the plaintiff W. A. Wilson

was $1,943.64, which, with the interest, amounted to $2,857.15 in February, 1879, and had been fully paid by the said W. A. Wilson; that the Snider farm, containing 236 acres, was of the fee simple value of $5,600, and of the annual value of $200; that although Watson Almond was the nominal purchaser of this tract of land on the 3d of January, 1872, the evidence pointed irresistibly to the conclusion that David Firebaugh was the beneficiary of the purchase, and that he had provided the purchase money so far as it had been paid. As to the property conveyed to Mason & Gooch by David Firebaugh, and afterwards by them to R. D. Firebaugh, trustee, the only portion that could be traced was the item of forty hogs, the proceeds of which were paid to said D. Firebaugh, and by him applied towards paying for the Snider farm, the balance of the purchase for which, with interest and costs, amounted, on the 1st of February, 1879, to $1,211.96; and that the aggregate amount which the commissioner considered as proved beyond question to have been paid by D. Firebaugh out of his private means for the said farm, was $2,450, however the fact might be as to the residue concerning which the evidence was not so conclusive.

Almond excepted to this report: 1st. Because there was not the slightest proof that W. A. Wilson had ever paid any portion of the amount decreed against him as surety for D. Firebaugh; and 2d. Because the commissioner based his conclusions on the impressions or heresay of certain witnesses, and not upon the evidence of facts; and it was suggested by counsel for Almond that an issue out of chancery would be the most proper means of a correct solution of the controversy.

On the 12th of March, 1879, the cause came on to be further heard on the report of the commissioner and the exceptions thereto; whereupon the court, without passing upon the report or considering the exceptions, decreed that

a jury be empanelled to try the issues, which are indicated by the following findings of the jury: 1st. That the Snider farm was on the 3d of January, 1872, in fact bought by the said D. Firebaugh, and that the purchase in the name of Watson Almond was merely a fraudulent device to cover up the transaction; and, 2d. That payments aggregating $3,239.05 were made by D. Firebaugh, or by Watson Almond, out of the means of said Firebaugh, on account of the purchase money of the said farm.

On the 25th of October, 1879, the cause came on to be further heard; whereupon, Watson Almond moved the court to set aside the findings of the jury and grant a retrial, on the ground that the findings were not sustained by the evidence; which motion the court overruled, being of opinion that there was a heavy preponderance of evidence in favor of the findings, to which ruling of the court the defendant Almond excepted. And afterwards such further proceedings were had that on the 16th of October, 1880, it appearing from the commissioner's report that the plaintiff had paid as security for David Firebaugh, executor of H. A. Firebaugh, deceased, the sum of $3,105.74, as of April 1st, 1880, of which the sum of $2,433.72 was principal, and that D. Firebaugh had paid $4,399.93, principal and interest, on the Snider farm, the court decreed that unless David Firebaugh, Watson Almond, or some one for them, should, within sixty days from the adjournment of the court, pay to the plaintiff the sum of $3,105.74 with interest and costs, the Snider farm should be sold at public auction by commissioners appointed for the purpose.

From this decree Watson Almond obtained a decree and *supersedeas* from a judge of this court.

*W. A. Anderson, J. B. Dorman* and *Tucker & Tucker,* for appellant.

*Edmund Pendleton,* for the appellee.

Almond v. Wilson.

STAPLES, J., delivered the opinion of the court.

This is a bill in equity to subject to the lien of the appellee's judgment his debtor's estate alleged to have been fraudulently conveyed to various persons, all of whom are made defendants. There is no charge of combination and confederacy among these alienees, and the objection is made that the bill is multifarious in uniting several defendants having no privity or connection with each other. Although a plaintiff cannot demand several matters of different natures against several defendants; a demurrer will not lie even though the defendants be unconnected with each other, if they have a common interest centering in the point in issue in the cause. 2 Maddox Chy. 294. Thus in *Mayor* v. *Pilkington*, 1 Atk. 282, it was held that a bill to quiet the plaintiff in a right of fishery might be brought against several defendants although there was no privity between them and the plaintiff, and they claimed distinct rights. The bill was sustained for the sake of peace and to prevent a multiplicity of suits. In Virginia it is common practice for a judgment creditor to unite in one bill any number of purchasers claiming different parcels of land by separate and distinct alienations. When the bill is against fraudulent alienees the matter in litigation is the fraud charged in the management and disposition of the debtor's property, in which charge all the defendants are interested, though in different degrees and proportions. As was said by Lord Cottingham in *Campbell* v. *Macky*, 1 Myl. & Craig. 603 : "The courts, in dealing with the question of multifariousness, seem to have considered what was convenient in the particular circumstances rather than to lay down any general rule on the subject." It has been well said if all the parties to a fraudulent transaction cannot be called to account in one suit, it is in the power of a dishonest debtor by a dis-

tribution of his property in minute portions among his relations and friends, to defraud his own creditors and set them at defiance with impunity. The expense and delay of separate suits will render their prosecution more than useless for all purposes of indemnity and relief. If the creditor is required to file a separate bill against each alienee, it will be productive of all the mischief and oppression attending a multiplicity of suits. He may obtain satisfaction from some of the alienees, thus rendering a prosecution of the suits against the others unnecessary and improper. If he should happen to err on the other side and sue only part, he may bring in persons against whom no charge can be supported as to whom the bill will be dismissed with costs, and after years of fruitless litigation the creditor must commence anew his pursuit of property, which has been in the meantime wasted or destroyed, with all the attending embarrassment resulting from the death of witnesses and the loss of testimony. On the other hand the inconvenience of uniting all the alienees in one suit will be comparatively trivial, for the court may adapt its decrees to the proofs against each and apportion the costs as may be just and expedient. This view is fully sustained by the authorities. Bump on Fraudulent Conveyances, p. 637, and cases there cited; *Fellows* v. *Fellows*, 4 Cowen, 682; *Brinkerhoff* v. *Brown*, 6 John. Ch. R. 139; *Jones' Ex'or* v. *Clark*, 25 Gratt. 642; *Boyden* v. *Lancaster*, 2 Patton & Heath, 198.

For these reasons we are of the opinion the demurrer was properly overruled. We are further of opinion, that the bill substantially charges a fraudulent combination between the appellant and David Firebaugh to hinder and delay the creditors of the latter in the collection of their debts. Where the facts stated show the fraudulent act and intent, it is a sufficient averment of fraud, although the bill does not state that the act was fraudulent. The charge in the

present bill, with respect to the sale of the property and the execution of the pretended lease, unmistakably indicate the grounds upon which the appellee proceeded. This was perfectly understood by the parties and the counsel in the court below. All the proofs taken, and all the proceedings had, were mainly with reference to the issue thus presented and passed upon in the circuit court. We are, therefore, of opinion this assignment of error is not well taken. We are further of opinion, that the circuit court very properly directed the three issues mentioned in the proceedings. The evidence relating to the matters in controversy was of a very conflicting character, involving, to a considerable extent, the credibility of some of the witnesses as well as their capacity and means of observation. The commissioner to whom the whole matter was first referred, reported against the claim of the appellant. That report did not in so many words impute actual fraud to the appellant, but such was the necessary result from the finding of the commissioner. For if the appellant suppressed the truth with respect to the payments of the purchase money for the land ; if these payments were not made by him, but by Firebaugh, as reported by the commissioner, the presumption of a fraudulent collusion is overwhelming. The counsel for the appellant so understood it; for in their exceptions to that report they say : "It is too improbable for belief, that men combining for the purpose of fraud should confide it to others they scarcely knew with no injunction of secrecy, knowing full well it would be repeated, and when the consummation of the fraud depended upon its being kept a secret and remaining unknown to the world."

In concluding these exceptions the learned counsel, in order to avoid the effect of the commissioner's report, suggest that an issue out of chancery would be the most proper means of a correct solution of the issues in this controversy.

The learned judge of the circuit court at once adopted

the suggestion, directed the issues, and gave the appellant the benefit of a hearing before the very tribunal he had requested. And now the action of the court is made the ground of exception and error upon which a reversal of the decree is gravely asked in this court.

An issue out of chancery except in cases of contested wills is a mere incident to the suit. Its object is to satisfy the conscience of the chancellor in a doubtful case. If he is not satisfied with the verdict he may set it aside and grant a new trial, or he may proceed to decide the cause without the intervention of another jury. *Lamberts* v. *Cooper's Ex'or*, 29 Gratt. 64. No injury can result to the defendant certainly in awarding it, unless it be a case in which the bill ought to be dismissed at the hearing.

But where the defendant himself concedes there is such a conflict of testimony as to call for a jury the court ought to feel less difficulty in directing it. In this case we have the report of the commissioner, the verdict of the jury and the opinion of the chancellor, all concurring, each one of whom was confronted with the witnesses and had the fullest opportunity of testing their accuracy, credibility and sources and means of information, under the test of a public cross-examination. Under such circumstances it would be an unusual exercise of appellate jurisdiction for this court to reverse the decee of the circuit court. Such a course would be in violation of the practice and rule of this court from the foundation of the government. The cases on this subject are numerous, and are perfectly familiar to the profession.

We are further of opinion that the circuit court committed no error in decreeing a sale of the whole tract of land to satisfy the appellee's judgments. The amount paid by Firebaugh to the appellant as by the verdict is more than sufficient to discharge the appellee's lien. The jury having found the arrangement between the appellant and Fire-

Almond v. Wilson.

baugh actually fraudulent, all idea of a resulting trust is excluded. Under such circumstances, if the appellant has made the payments claimed by his counsel, he has no just claim to participate even *pro tanto* with the appellees in the proceeds of the land. No right can be deduced from a fraudulent act. The law does not so far countenance fraudulent contracts as to protect the perpetrator to the extent of his investment. Bump on F. Conveyances, 595; *Williamson's Ex'or* v. *Goodwyn*, 9 Gratt. 503; *Baltimore and Ohio Railroad Company* v. *Soutter*, 13 Wall. 517; *Henderson* v. *Hunton and als.* 26 Gratt. 934; 2 Minor Inst. 609.

We are, therefore, of opinion that the decree of the circuit court should be affirmed.

DECREE AFFIRMED.